IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

TEE TEE FIT, LLC, TIJANA STEVENS,
and MARSHA BENDLE

      Plaintiffs,

v.                                       CASE NO: 3:25-cv-00905

MADABOLIC FRANCHISE SYSTEM,
LLC and RICK DEL SONTRO,

      Defendants.

_____/

## COMPLAINT

      This is an action brought by TEE TEE FIT, LLC, TIJANA STEVENS, and MARSHA BENDLE (hereinafter collectively referred to as "Plaintiffs") against MADABOLIC FRANCHISE SYSTEM, LLC and RICK DEL SONTRO (hereinafter collectively referred to as "Defendants") related to the Franchise Agreement between TEE TEE FIT, LLC ("TTF" or "Franchisee") and MADABOLIC FRANCHISE SYSTEM, LLC ("MADabolic" or "Franchisor") in which the parties agreed TTF would operate a MADabolic franchised business in the St. Petersburg, Florida region.

      As further described in this Complaint, MADabolic and Rick Del Sontro repeatedly and systemically misrepresented the actual costs associated with opening and operating a MADabolic franchised business. Further, MADabolic required participation in vendor programs without contracts, due diligence, or transparency. Plaintiffs have suffered substantial financial harm due to mismanagement and non-performance. Further, MADabolic had repeated website and contract management failures – including misrepresented pricing, removal of Plaintiffs' St. Petersburg, Florida location during marketing campaigns, and issued incorrect client contracts. Lastly,

1

Defendants tortiously interfered with Plaintiffs as they tried to have a successful exit from the business. All of the foregoing caused significant financial loss and harm to Plaintiffs' business operations. Accordingly, this action states the following seven separate causes of action: (1) fraudulent misrepresentation; (2) fraudulent concealment; (3) civil conspiracy; (4) breach of good faith and fair dealing; (5) unjust enrichment; (6) violation of the North Carolina Unfair and Deceptive Trade Practices Act; and (7) tortious interference with a prospective economic advantage.

## I.     PARTIES, JURISDICTION, AND VENUE

1.      Tee Tee Fit, LLC is a Florida limited liability company with its principal place of business located at 2430 5th Ave S. UNIT B, St. Petersburg, FL 33712.

2.      Tijana Stevens is the President and co-owner of TTF and a current resident of St. Petersburg, FL.

3.      Marsha Bendle is co-owner of TTF and is a current resident of Columbus, OH.

4.      MADabolic is a registered Delaware limited liability company with its principal place of business located at 2610 South Blvd., Charlotte, North Carolina 28209.

5.      Rick Del Sontro, upon information and belief, is the Chief Executive Officer of MADabolic and a resident of Washington, D.C.

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the Parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00.

7.      This Court has *in personam* jurisdiction over Defendant MADabolic as MADabolic's principal place of business is located in North Carolina. Likewise, this court has *in personam* jurisdiction over Rick Del Sontro as CEO of MADabolic, a North Carolina limited

liability corporation. Further, MADabolic submitted to jurisdiction in the Franchise Agreement from which this dispute arises, by expressly agreeing that parties "may file a lawsuit in any state or federal court of general jurisdiction in the county in which we maintain our principal place of business at the time the lawsuit is filed (currently, Mecklenburg County, North Carolina)[.]"

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in the District. In addition, under Section 23 of the Franchise Agreement, MADabolic agreed to submit to the venue of this Court.

## II.     FACTUAL BACKGROUND

9.     MADabolic is a franchisor, offering franchised businesses that operate as athletic conditioning facilities.

10.     In or about June 2021, Plaintiffs received a copy of MADabolic's Franchise Disclosure Document ("FDD"). A true and correct copy of the FDD is attached hereto as **Exhibit A**. The FDD is a legal document that franchisors must provide (under the Federal Franchise Rule) to potential franchisees before selling a franchise. It contains comprehensive information about the franchise, such as its history, financials, fees, and rules to help potential franchise buyers make an informed decision.

11.     In or about August 2021, Tijana Stevens and Marsha Bendle attended MADabolic's so-called "Discovery Days" marketing event.

12.     During the Discovery Days event, MADabolic leadership presented financial models and success projections that portrayed franchise ownership as highly lucrative and profitable.

3

13.     Relying on these representations, Plaintiffs decided to invest in the franchise and paid a $40,000 franchise fee in or about December 2021.

14.     TTF executed the Franchise Agreement ("Franchise Agreement") on or about December 8, 2021. A true and correct copy of the Franchise Agreement is attached hereto as **Exhibit B.**

15.     Plaintiffs initiated a Small Business Administration ("SBA") loan application through Craft Bank to help secure the financing necessary to open the franchised business.

16.     During the loan application process, Craft Bank expressed concerns that MADabolic's financial projections were inflated and unrealistic.

17.     Upon learning this, MADabolic's President, Rick Del Sontro, subsequently altered the financial models to misrepresent the business' potential success and viability.

18.     Upon information and belief, Rick Del Sontro is permanently barred from participating in any federally-related or federally-insured loan programs as a result of prior misconduct. *See* Consent Decree and Order of Settlement Concerning Rick Del Sontro and the Rainy Day Foundation, Inc. at pg. 7, attached hereto as **Exhibit C** ("Settling Defendants agree to be debarred from directly or indirectly participating in any way in any program concerning federally-related or federally-insured loans. . .[.] Settling Defendants agree to permanently cease from directly or indirectly participating in any fashion in any activity having to do with the provision of monies to any borrower whose loan is involved in any federally-related program or is federally-insured."

19.     The United States SBA Loan program is a federally-related and federally-guaranteed loan program.

4

20.     Rick Del Sontro had ongoing, direct communications with Craft Bank, Plaintiffs' SBA lender, in order to convince Craft Bank to issue an SBA loan to Plaintiffs, despite Craft Bank's initial reservations about issuing such a loan.

21.     Plaintiffs were unaware that Rick Del Sontro was barred from participating in federally-related loan programs.

22.     Plaintiffs justifiably relied on the altered financial models provided by Rick Del Sontro and MADabolic.

23.     Plaintiffs continued pursuing the business loan and Craft Bank subsequently approved Plaintiffs' loan application.

24.     Shortly thereafter, MADabolic began pressuring TTF's President, Tijana Stevens, to abandon her full-time employment in Charlotte, North Carolina in order to relocate immediately to TTF's assigned territory of St. Petersburg, Florida.

25.     This is despite the fact that a commercial lease had not yet been secured for the opening of Plaintiffs' franchised business.

26.     MADabolic's approved real estate broker, Jason Kastner, Managing Director of Dochter & Alexander Retail Advisors, continually failed to secure a viable location.

27.     This led to delays in opening Plaintiffs' franchise business, business opportunities, and lost potential revenue.

28.     This also led to the loss of Ms. Stevens' full-time income after being pressured to abandon her full-time employment back home in Charlotte.

29.     After eight months of delays, Plaintiffs retained a local broker to secure a retail location.

30.     Despite reviewing more than sixty options of commercial properties provided by Plaintiffs' independent broker, MADabolic did not accept a single option.

31.     During this process, Rick Del Sontro and MADabolic attempted to pressure Plaintiffs into signing a commercial lease for $16,000/month - $6,000 more than the placeholder used in the original financial model provided during Discovery Days.

32.     Rick Del Sontro and MADabolic repeatedly dismissed Plaintiffs concerns regarding this inflated overhead expense harming the financial viability of the business model.

33.     After twelve fruitless months of searching, the site selection territory was expanded.

34.     A commercial lease was finally secured in or about July 2023 – 18 months after the Franchise Agreement was signed.

35.     MADabolic continually misrepresented to Plaintiffs that site selection typically takes between three and four months.

36.     MADabolic made continuous misrepresentations to Plaintiffs and other franchisees that opening a MADabolic franchise costs a franchisee ~$287,000.

37.     This financial model regarding the actual capital needed to launch and operate a MADabolic franchise is grossly inaccurate and misleading.

38.     The true cost of opening the franchised business is close to three times the ~$287,000 that was advertised.

39.     In or about July 2022, Plaintiffs formally raised concerns regarding the misrepresentations.

40.     Rick Del Sontro and MADabolic expressed to Plaintiffs that listed costs in the FDD were either compounded or reallocated in other areas of the SBA loan.

6

41.     Later, when Plaintiffs once again formally raised concerns regarding the misrepresentations, Rick Del Sontro and MADabolic addressed the discrepancy by saying that costs had risen in the 18 months between signing the Franchise Agreement and securing a commercial lease.

42.     Rick Del Sontro and MADabolic critically understated the capital required to survive the first year of operations.

43.     Due to these financial misrepresentations regarding start-up costs, TTF fully depleted its working capital within months of opening its franchised business.

44.     As a result, Tijana Stevens and Marsha Bendle were forced to make personal cash injections in the hundreds of thousands of dollars to keep the business afloat.

45.     Construction of the Plaintiffs' franchised business began in or about February 2024 with the work being undertaken by MADabolic's approved vendor, Rollout Connection ("RC"), who was approved as a "construction liaison."

46.     Despite RC's failures with several franchise locations, MADabolic strongly endorsed RC.

47.     Depending on RC's "money-back guarantee" - which promised to offset their ~$21,000 fee through cost savings or money back – Plaintiffs engaged RC for Phase 1 of their two-phase package.

48.     Upon completion of Phase 1, Plaintiffs decided not to proceed with RC for Phase 2.

49.     Rick Del Sontro and MADabolic subsequently pressured Plaintiffs to proceed with RC for Phase 2, to which Plaintiffs reluctantly agreed.

50.     RC mismanaged Phase 2 of the construction phase and failed to include known soundproofing costs, resulting in roughly $60,000 in unexpected expenses.

51.     These unexpected expenses further depleted Plaintiffs' working capital, further exasperating an issue created by MADabolic.

52.     Despite repeated requests, RC never refunded any sums to Plaintiffs under its "money-back guarantee."

53.     MADabolic refused to intervene or aid Plaintiffs in recovering funds from RC.

54.     Despite Plaintiffs' strict adherence to MADabolic's guidance for operations and marketing for eight months, Plaintiffs' franchised business struggled to retain clients and revenue accordingly declined.

55.     The declining revenue forced Tijana Stevens and Marsha Bendle to inject personal funds into overhead expenses for the business to stay afloat.

56.     After expressing the financial pressures to MADabolic and Rick Del Sontro, MADabolic offered to waive the royalty fee for six months with a six-month extension.

57.     This suggested relief, however, was conditioned on signing a broad legal release, waiving all rights to pursue MADabolic or its vendors for past or future claims.

58.     The legal release was not disclosed up front to Plaintiffs.

59.     After reviewing the legal release, Plaintiffs did not agree to the temporary relief.

60.     In or about April 2025, Rick Del Sontro and MADabolic offered a $45,000 refund for the faulty work and/or services rendered by RC.

61.     This compensation was once again conditioned on signing a broad legal release and gag order.

62.     MADabolic refused to omit the legal release from the document, and ultimately no monetary relief was given to Plaintiffs as a result of RC's defective work and/or services.

63.     In or about September 2024, Plaintiffs learned that MADabolic's corporate website advertised membership pricing for Plaintiffs' St. Petersburg location at a significantly higher rate than what Plaintiffs were actually charging.

64.     This discrepancy existed for an extended period without Plaintiffs' knowledge and deterred prospective members who were directed to the MADabolic corporate website and misinformed about Plaintiffs' pricing.

65.     The MADabolic corporate website consistently advertised incorrect trial offers and product pricing.

66.     Further, during the Parallel Path marketing pilot, Plaintiffs' St. Petersburg location was entirely removed from the MADabolic corporate website, meaning Plaintiffs' franchised business was not listed as an active studio.

67.     This occurred while Plaintiffs were actively investing in marketing efforts that directed traffic to MADabolic's corporate website.

68.     As a result, prospective clients could not find or access Plaintiffs' St. Petersburg location online, directly impacting Plaintiffs' lead generation and sales.

69.     In or about November 2024, MADabolic corporate advertised a promotion offer of $99/month for a 12-month membership.

70.     This promotion was intended to be a 3-month discount, after which pricing would revert to Plaintiffs' standard $188/month rate.

71.     However, due to incorrect contract templates uploaded by MADabolic corporate, clients were grandfathered into a $99/month rate for the entire year, resulting in a financial loss of $1,692 per client who purchased during the Black Friday 2024 promotional period.

72.     In or about November 2024, MADabolic mandated a Customer Relationship Management ("CRM") software migration from Mindbody to Walla.

73.     The migration was disproportionally imposed on newer franchises first, effectively making Plaintiffs' St. Petersburg location a test case.

74.     The timing of the software migration coincided with Black Friday and the year-end promotional season – two of the most important revenue-generating periods of the year.

75.     As a result of the CRM software migration, Plaintiffs experienced widespread system failures including:

> i.      Billing errors;
>
> ii.     Inaccurate membership contracts; and
>
> iii.    Broken document upload functionality.

76.     These failures triggered membership cancellations, operational confusion, and loss of goodwill within Plaintiffs' client base and community.

77.     In or about June 2025, MADabolic announced that all franchised businesses would be required to revert back to the original CRM platform Mindbody at their own expense.

78.     MADabolic promised a refund of the initial $500 data transfer fee but later rescinded this offer to Plaintiffs' and other franchisees.

79.     In or about January 2025, Plaintiffs requested a discussion with Franchisor to discuss reasons the franchised business was floundering, and to seek guidance from Franchisor as to affirmative steps to help grow the business.

80.     During this meeting, Rick Del Sontro and MADabolic advised Plaintiffs to completely stop paying rent, in clear violation of the terms of the commercial lease.

81.     In or about February through April 2025, MADabolic instructed Plaintiffs to join a 90-day pilot marketing program with Parallel Path, one of only two MADabolic-approved digital marketing vendors.

82.     Despite multiple requests, no written contract or terms of engagement were ever provided to Plaintiffs.

83.     Plaintiffs reluctantly remitted payment to Parallel Path based on MADabolic's oral assurances as to the terms of the vendor agreement.

84.     Only after Plaintiffs remitted payment did TTF learn that MADabolic corporate would retain administrative access while franchisees were denied direct contact with Parallel Path.

85.     Despite Plaintiffs' payment and MADabolic's oral assurances, Plaintiffs had no access to data on performance, platform choices, ad content, or lead generation mechanisms.

86.     Plaintiffs subsequently learned that an advertisement generated through the Parallel Path program was marketing franchise sales instead of membership acquisition, which was the Parallel Path pilot's stated objective.

87.     Upon information and belief, MADabolic directed Parallel Path to spend Plaintiffs' and other franchisees' marketing funds on promoting franchise sales as opposed to membership acquisition for each respective franchised business.

88.     Upon information and belief, MADabolic systemically directed Plaintiffs' marketing funds to ineffective platforms with no measurable return on investment.

89.     Plaintiffs requested approval to work with a local marketing firm in an attempt to stabilize and grow their membership base. This request was flatly denied by MADabolic who insisted on the use of approved vendors only.

90.     This restriction directly harmed Plaintiffs' revenue generation and contributed to Plaintiffs' financial deterioration.

91.     Due to ongoing losses and the depletion of working capital, Plaintiffs began the process of selling the franchised business in or about April 2025.

92.     TTF entered preliminary negotiations with the owner of a MADabolic franchise in Tampa, Florida – Mr. Todd Reisner.

93.     In or about June 2025, during Plaintiffs' third call with Mr. Reisner, Plaintiffs were informed that Rick Del Sontro had contacted Mr. Reisner directly to discuss the terms of the sale.

94.     During this conversation, Rick Del Sontro told Mr. Reisner that Plaintiffs' asking price was too high.

95.     Rick Del Sontro's unnecessary insertion into the sale negotiations between Plaintiffs and Mr. Reisner completely sabotaged Plaintiffs' ability to negotiate independently.

96.     Rick Del Sontro pressured Plaintiffs to accept the terms of Mr. Reisner's offer, despite it being far less than what Plaintiffs perceived to be fair market value.

97.     In or about July 2025, Plaintiffs attempted to sell the full suite of gym equipment that furnished their franchise to a separate franchisee named Chris Savory who was opening a MADabolic franchised business in Jacksonville, Florida.

98.     In or about September 2025, Plaintiffs once again reached out to Chris Savory to inquire about their interest in purchasing their like-new suite of gym equipment.

12

99. Plaintiffs were informed by Chris savory that Rick Del Sontro once again wrongfully interfered with this transaction, informing Chris Savory that he should not negotiate with Plaintiffs.

100. As a result, Plaintiffs were forced to retain the services of a liquidation company for the sale of their gym equipment. After auction, only $6,000 was obtained for Plaintiffs' like-new equipment, despite initially paying $72,000 brand new and offering to sell to Chris Savory for a roughly 50% discount.

101. Rick Del Sontro's interference in the sale negotiations of Plaintiffs' franchised business and gym equipment crossed the line from neutral franchisor to conflicted intermediary.

102. MADabolic benefits from the sale of Plaintiffs' franchised business through franchise continuation and fees.

103. MADabolic benefits from the sale of brand-new gym equipment packages due to a substantial 100% markup of what comparable new equipment could be purchased for on the open market.

104. In or about June 2025, Plaintiffs were contacted by Kirk Dewalle of MADabolic. Kirk Dewalle suggested that MADabolic would potentially take over the franchised business' commercial lease if Plaintiffs stopped paying rent.

105. To this end, Kirk Dewalle suggested MADabolic would then negotiate with the commercial landlord directly, thus cutting Plaintiffs out of the deal entirely, despite Plaintiffs' full ownership of the business and territory rights.

106. However, MADabolic's conduct directly contributed to the landlord's refusal to sign a separate lease with another MADabolic franchisee, thus rendering it impossible for Plaintiffs to sell their franchised business and preventing a reasonable exit.

13

107. On or about the same day as Plaintiffs' conversation with Kirk Dewalle, Plaintiffs received an email from Rick Del Sontro advising Plaintiffs to file for Subchapter 5 of Chapter 11 bankruptcy. Subchapter 5 disproportionately benefits the franchisor rather than the franchisee.

108. Rick Del Sontro's inappropriate legal advice was a tactic to capture control of Plaintiffs' franchised business from Plaintiffs.

109. In or about August 2025, Plaintiffs were informed by their business broker, Ms. Nicole Potts, that Plaintiffs' commercial landlord had been approached by Todd Reisner and Rick Del Sontro with a plan to acquire Plaintiffs' lease and purchase Plaintiffs' equipment directly from Plaintiffs' secured lender, Craft Bank.

110. This evidences a scheme of MADabolic and Rick Del Sontro to:

    i. Exclude Plaintiffs from any involvement in, or proceeds from, the sale of Plaintiffs' franchised business.

    ii. Obtain the lease rights without compensating Plaintiffs for the value of the business;

    iii. Acquire the Plaintiff's equipment at a substantially discounted price; and

    iv. Preserve MADabolic's brand image by preventing the public perception of another franchise closure.

111. MADabolic and Rick Del Sontro's systemic and continuous course of action in interfering with business sales, conditioning refunds on legal waivers, proposing bankruptcy under economic duress, and misrepresenting franchise economics demonstrate a pattern of coercion and overreach.

14

112. Upon information and belief, MADabolic's aforementioned systemic and continuous course of action has bankrupted other first-generation MADabolic franchisees, including those with franchised businesses in Stamford, Asheville, Centera, and Westminster.

### III. CAUSES OF ACTION

### Count I – Fraudulent Misrepresentation
### (All Plaintiffs against MADabolic and Rick Del Sontro)

113. Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen as if fully restated herein.

114. MADabolic, by and through its agents, officers, employees, and authorized representatives, including, but not limited to, Rick Del Sontro, Al Mendoza, Kirk Dewalle, Danielle Scott, and Brandon Cullen made representations of an existing or past fact.

115. The representations were false when made.

116. The representations were in regard to material facts.

117. The false representations were made either knowingly or without belief in their truth or recklessly.

118. The false misrepresentations were made with the intent to deceive Plaintiffs to induce Plaintiffs into opening a MADabolic franchised business.

119. The false misrepresentations were made with the intent to deceive Plaintiffs to induce Plaintiffs into a specific course of operations of Plaintiffs' franchised business.

120. Plaintiffs reasonably relied on the misrepresented material facts and were in fact deceived by MADabolic and Rick Del Sontro's material misrepresentations.

121. Plaintiffs would not have agreed to become a franchisee and would not have personally invested their own money to keep the business open but for MADabolic and Rick Del Sontro's material misrepresentations.

15

122.    Plaintiffs have suffered actual damages as a result of the defendants' fraudulent misrepresentations.

### Count II – Fraudulent Concealment and Failure to Disclose
### (All Plaintiffs against MADabolic and Rick Del Sontro)

123.    Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen  as if fully restated herein.

124.    MADabolic and Rick Del Sontro had a duty to disclose the following under the FTC Rule Governing Offer and Sale of Franchises:

     a.  Cost of Opening a Franchise Location.

     b.  An accurate estimated initial investment, including the working capital needed to sustain the business during the first year of business.

     c.  Complete names, addresses, and contact information for actual franchisees.

125.    This information is deemed material by the FTC and was material to Plaintiffs.

126.    MADabolic also concealed the fact that the entire MADabolic franchise system was failing.

127.    In an effort to conceal the failing health of the franchise system as a whole, MADabolic prevented its franchisees from communicating with one another.

128.    Further, despite written requests from Plaintiffs, MADabolic failed to provide specific franchisee information, including contact information and performance data, so that Plaintiffs could contact these parties as part of their due diligence efforts.

129.    The information was known and concealed by MADabolic and its agents, officers, employees, and authorized representatives, including, but not limited to, Rick Del Sontro, Brandon Cullen, and Kirk Dewalle.

130.     Had Plaintiffs received the information MADabolic was obligated to disclose, Plaintiffs would have discovered the true expense of performing its obligations under the Franchise Agreement and would not have purchased the franchise.

131.     Plaintiffs were deceived by MADabolic and Rick Del Sontro's fraudulent concealment and failures to disclose.

132.     Plaintiffs would not have agreed to become a franchisee and would not have personally invested their own money to keep the business open but for MADabolic and Rick Del Sontro's fraudulent concealment and failures to disclose.

133.     Plaintiffs have suffered actual damages as a result of MADabolic and Rick Del Sontro's fraudulent concealment and failures to disclose.

## Count III – Civil Conspiracy
### (All Plaintiffs against MADabolic and Rick Del Sontro)

134.     Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen as if fully restated herein.

135.     MADabolic and Rick Del Sontro conspired with each other to fraudulently induce Plaintiffs into executing the Franchise Agreement through a series of knowing and intentional misrepresentations of key facts regarding the proposed franchise relationship.

136.     At all times relevant to this cause of action, Rick Del Sontro was not an employee of the Franchisor. *See* Ex. A at pgs. 4, 5 (Rick Del Sontro was "not an employee of the franchisor entity and [did] not have a title with the franchisor entity.")

137.     Further, Rick Del Sontro engaged in fraudulent misrepresentations and concealments in order to confer a benefit upon himself individually.

138.     MADabolic and Rick Del Sontro conspired with each other and other non-party vendors, including but not limited to RC, Parallel Path, and Walla, to fraudulently induce Plaintiffs

into a specific course of operations including the execution of various vendor agreements that benefited MADabolic corporate and harmed Plaintiffs and other franchisees.

139. This was done with the sole purpose to wrongfully and fraudulently deprive Plaintiffs of their property.

140. As a direct and proximate result of the foregoing conspiracies, Plaintiffs have sustained substantial damages in an amount to be proven at trial.

### Count IV – Breach of the Covenant of Good Faith and Fair Dealing
### (TTF against MADabolic)

141. Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen as if fully restated herein.

142. An independent, valid contract exists in the form of the Franchise Agreement.

143. Every contract contains an implied covenant of good faith and fair dealing that imposes on the parties to such contract that the parties thereto do everything necessary to carry out their respective obligations under such contract.

144. MADabolic breached the covenant of good faith and fair dealing through its failure to honestly pursue its intention to perform under the Franchise Agreement in number of different ways including, but not limited to:

a. Delaying the process of securing a viable commercial lease for approximately eighteen months;

b. Critically understating the capital required to survive the first year of operations;

c. Failing to intermediate between Plaintiffs and MADabolic's approved construction liaison vendor RC after RC's defective work and/or services led to over $60,000 of additional expenses;

d.      Interfering with the sale of Plaintiffs' franchised business to Mr. Todd Reisner;

e.      Insisting on Plaintiffs' enrollment into the Parallel Path marketing pilot while refusing to provide a written contract for the same despite multiple requests from Plaintiffs;

f.      Refusing to allow Plaintiffs to work with local marketing agencies to help grow membership;

g.      Failing to strategically deploy the CRM software migration in a seamless manner that would not harm Plaintiffs;

h.      Failing to list Plaintiffs' St. Petersburg franchised business as an active MADabolic location on the MADabolic corporate website; and

i.      Offering faulty promotions to potential clients that lasted twelve months as opposed to the intended three months.

145.    Further, MADabolic failed to provide ongoing assistance to Plaintiffs as agreed under the Franchise Agreement.

146.    MADabolic's knowing and intentional refusal to honor its own obligations under the Franchise Agreement amounts to a breach of the covenant of good faith and fair dealing.

147.    MADabolic's actions and inactions have injured TTF's right to receive benefits under the Franchise Agreement.

148.    As such, Plaintiffs have been injured and are entitled to damages in an amount to be proven at trial.

## Count V – Unjust Enrichment
### (TTF against MADabolic)

149.    Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen  as if fully restated herein.

150. This Count is pled in the alternative to Count IV in the event it is found that no valid or enforceable contract exists between the parties.

151. TTF has conferred a monetary benefit upon MADabolic in the form of the initial franchise fee, advertising fees, royalty fees, and other fees paid to MADabolic and MADabolic's preferred vendors.

152. MADabolic has provided nearly nothing of value in exchange for this monetary benefit.

153. TTF was obstructed and precluded from operating a successful franchised business due to MADabolic's actions.

154. It would be unjust and inequitable for MADabolic to retain this monetary benefit at the expense of TTF.

155. As such, TTF has been injured and are entitled to damages in an amount to be proven at trial.

**Count VI – Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**(All Plaintiffs against MADabolic and Rick Del Sontro)**

156. Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen as if fully restated herein.

157. Under Chapter 66, Article 19 of the North Carolina General Statutes, governing Business Opportunity Sales, MADabolic meets the definition of a business opportunity seller.

158. Chapter 66, Article 19, Section 98 of the North Carolina General Statutes provides that business opportunity sellers shall not:

a. represent that the business opportunity provides income or earning potential of any kind unless the seller has documented data to substantiate the claims of income or earning potential and discloses this data to the prospective purchaser at the time such representations are made.

20

159.     Chapter 66, Article 19, Section 100 of the North Carolina General Statutes provides that:

b.      If a business opportunity seller uses any untrue or misleading statements in the sale of a business opportunity, or fails to give the proper disclosures in the manner required by G.S. 66-95, or fails to deliver the equipment, supplies or product(s) necessary to being substantial operation of the business within 45 days of the delivery date stated in the business opportunity contract, or if the contract does not comply with the requirements of G.S. 66-99, then, within one year of the date of the contract, upon written notice to the seller, the purchaser may void the contract and shall be entitled to receive from the business opportunity seller all sums paid to the business opportunity seller.

c.      **The violation of any provisions of this Article shall constitute an unfair practice under G.S. 75-1.1.** (Emphasis added).

160.     Section 75-1.1 of the North Carolina Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

161.     Section 75-16 of the North Carolina Deceptive Trade Practices Act provides that a harmed party shall have a right of action on account of injury and shall be entitled to treble damages.

162.     MADabolic is subject to the North Carolina Deceptive Trade Practices Act and North Carolina law governing the sales of business opportunities as MADabolic is a North Carolina limited liability company operating in the State of North Carolina and the Franchise Agreement provides that North Carolina law shall govern the interpretation of the Agreements and govern any dispute.

163.     MADabolic, as a business opportunity seller, made false, untrue, and misleading statements in the offer of its business opportunity, as stated at length throughout this lawsuit, to Plaintiffs, which Plaintiffs relied upon in purchasing the business opportunity from MADabolic.

164.     As MADabolic and Rick Del Sontro have made numerous, and well-documented, false, untrue, and misleading statements in the offer of its business opportunity, as stated at length throughout this lawsuit, MADabolic and Rick Del Sontro have committed an unfair trade practice under G.S. 75-1.1 against Plaintiffs.

165.     MADabolic and Rick Del Sontro have violated the North Carolina Law governing business opportunity sales and the North Carolina Deceptive Trade Practices Act and have caused Plaintiffs to suffer actual damages.

166.     Plaintiffs are entitled to judgment against MADabolic and Rick Del Sontro for their knowing and continual violations of North Carolina law.

### Count VII – Tortious Interference with Prospective Economic Advantage
### (All Plaintiffs against MADabolic and Rick Del Sontro)

167.     Plaintiffs reference and reincorporate paragraphs one through one hundred and fourteen  as if fully restated herein.

168.     Plaintiffs were engaged in negotiations with a third party, Mr. Todd Reisner, for the purchase and sale of Plaintiffs' franchised business located in St. Petersburg, Florida.

169.     Plaintiffs were engaged in negotiations with a third party, Chris Savory, for the purchase and sale of Plaintiffs' full suite of gym equipment.

170.     MADabolic and Rick Del Sontro induced the third party, Mr. Todd Reisner, to refrain from entering into a purchase and sale agreement with Plaintiffs after Rick Del Sontro told Mr. Reisner that Plaintiffs' asking price was too high.

171.    MADabolic and Rick Del Sontro induced the third party, Mr. Chris Savory, to refrain from entering into a purchase and sale agreement with Plaintiffs after Rick Del Sontro told Mr. Savory not to negotiate with Plaintiffs.

172.    MADabolic and Rick Del Sontro's interference with the negotiations between Plaintiffs and Mr. Todd Reisner was not justified.

173.    MADabolic and Rick Del Sontro's interference with the negotiations between Plaintiffs and Mr. Chris Savory was not justified.

174.    Without MADabolic and Rick Del Sontro's interference, a purchase and sale agreement would have been reached between Plaintiffs and the third parties.

175.    As a direct and proximate result of MADabolic and Rick Del Sontro's unjustified interference, Plaintiffs have sustained substantial damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

a.      Judgment awarding Plaintiffs all actual damages caused by MADabolic and Rick Del Sontro;

b.      Judgment awarding Plaintiffs punitive damages in the maximum amount allowable under North Carolina law;

c.      Judgment awarding Plaintiffs treble damages under the North Carolina Deceptive Trade Practices Act;

d.      Judgment awarding Plaintiffs all reasonable and necessary attorneys' fees and expenses incurred in this matter;

e.  Judgment awarding Plaintiffs pre-judgment and post-judgment interest in the

highest amount allowed by law;

f.  Judgment awarding Plaintiffs all costs of court; and

g.  Such other and further relief to which Plaintiffs may be justly entitled.

*/s/ Marshall Jones*_____
**MARSHALL JONES**
N.C. Bar No. 53996
Nelson Mullins Riley & Scarborough LLP
301 South College Street, 23rd Floor
Charlotte, North Carolina 28202
T: 704-417-3017
F: 704-377-4814
Email: marshall.jones@nelsonmullins.com

**JACKSON OLSEN**
Florida Bar No. 1036194
Email: jolsen@lawcantrell.com
**WILLIAM J. CANTRELL**
Florida Bar No. 103254
Email: wcantrell@lawcantrell.com
 **CANTRELL SCHUETTE, P.A.**
 401 East Jackson Street, Suite 2340
 Tampa, Florida 33602
 Telephone: (877) 858-6868

*Pro hac vice applications forthcoming*

24